891 F.Supp. 492 (1995)
ANSCHUTZ MINING CORPORATION, Plaintiff,
v.
NL INDUSTRIES, INC., Defendant.
No. 1:88 CV 72 SNL.
United States District Court, E.D. Missouri, Southeastern Division.
June 23, 1995.
*493 Maurice B. Graham, Padberg McSweeney, St. Louis, MO, Norella Huggins and George D. Martin, Armstrong Teasdale Schlafly & Davis, St. Louis, MO, and Richard A. Oertli, Holme Roberts & Owen, Denver, CO, for plaintiff.
John L. Oliver, Jr. and J. Fred Waltz, Oliver Oliver Waltz & Cook, Cape Girardeau, MO, and Marcus Martin, Bartlit Beck Herman Palenchar & Scott, Denver, CO, for defendant.

MEMORANDUM OPINION AND ORDER
LIMBAUGH, District Judge.
This matter is before the Court on the Plaintiff's request for a declaratory judgment and reimbursement for cleanup costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.

Statement of Facts
The center of this suit is a tract of land near Fredericktown, Missouri. Since the mid 1800s, the area has been operated sporadically as a mine, smelter, mill, and tailings disposal area. From 1902 to 1922, the North American Lead Company and Missouri Cobalt Company worked the mine and produced nearly 700,000 tons of waste solids. From 1944 to 1961, the National Lead Company (now NL Industries) mined the property continuously and created shafts which contain mining refuse and generated nearly 4.5 million tons of tailings.
In 1978, National Lead sold the property to two local businessmen. One year later, after a dramatic increase in the price of cobalt, an element believed to be abundant at the site, the businessmen were able to sell an option to NEDLOG, which in turn was able to sell the property to Anschutz Mining Corporation for Ten Million Dollars ($10,000,000).
Because of the years of neglect, it took Anschutz some time to bring the mine back to an operable condition. By the time the mine was ready, the price of cobalt had plummeted and the venture was halted because it was no longer profitable. Anschutz was able to gather some of the surface cobalt from the *494 tailings piles, but there was never any active mining of the site by Anschutz.
There has been no further activity at the site. It is surrounded by a chain link fence to keep out trespassers and there is a part-time watchman who maintains the integrity of the fence. The video tour provides a clear picture of the current condition of the facility.

Discussion
This action is a private action brought by the current property owner against a previous owner and operator. As the law has become more hostile towards businesses that alter the environment as a byproduct of their industrial efforts, Congress has attempted to share the heavy cleanup burden with successive owners. After all, even though a party may be the current owner of a facility he may not be the main contributor to the environmental problems.
With that in mind, Congress enacted CERCLA. It was "enacted in 1980 to accomplish the dual purpose of ensuring the prompt cleanup of hazardous waste sites and imposing the costs of such cleanups on responsible parties." Dico Inc. v. Diamond, 35 F.3d 348, 349 (8th Cir.1994) citing General Elec. Co. v. Litton Indus. Automation Sys. Inc., 920 F.2d 1415, 1422 (8th Cir.1990), cert. denied, 499 U.S. 937, 111 S.Ct. 1390, 113 L.Ed.2d 446 (1991).
In order for an action to fall under the aegis of CERCLA, it must fit within a framework that has been developed through case law. The statute itself does not specifically list the prima facie elements of a claim, but the case law is in agreement that the elements are: (1) the defendant must fall within one of four categories of "covered persons", 42 U.S.C. § 9607(a); (2) there must have been a "release or threatened release" of hazardous substance from the facility, § 9607(a)(4), 9601(14), (22); (3) the release or threatened release must "cause the incurrence of response costs" by the plaintiff, § 9607(a)(4); and (4) response costs must be necessary costs and consistent with the National Contingency Plan (NCP). §§ 9607(a)(4)(B), 9601(23)-(25). See, Stewman v. Mid-South Products of Mena, Inc., 993 F.2d 646, 648 (8th Cir.1993); See also, Dedham Water Co. v. Cumberland Farms Dairy, Inc., 889 F.2d 1146, 1150 (1st Cir. 1989).
In the case at hand, all the elements of CERCLA are met. The Defendant is a covered person because NL Industries qualifies under § 9607(a)(2) as "any person who at the time of disposal of any hazardous substance owned or operated a facility at which such hazardous substances were disposed." The parties cannot dispute that a release occurred as defined by 42 U.S.C. 9601(22) nor does the Court have any doubt, despite the defendant's argument for the exclusion of mining waste, that the material is hazardous as defined by statute. 42 U.S.C. 9601(14); Eagle-Picher Industries v. US E.P.A., 759 F.2d 922, 926 (DC.Cir.1985); Idaho v. Bunker Hill Co., 635 F.Supp. 665, 673 (D.Idaho 1986).
The next two prongs of the CERCLA test are more contested, but nonetheless applicable. In the first place, the Court makes the factual finding that the site poses a significant threat to human health and the environment. (Uncontrolled Hazardous Waste Site Investigation, prepared by the Missouri Department of Natural Resources, Pltf. Ex. 581 at 1). Secondly, the eighth circuit has found that CERCLA "is a strict liability statute, with only a limited number of statutorily-defined defenses available." General Electric Co. v. Litton Indus. Automation Sys., Inc., 920 F.2d 1415, 1418 (8th Cir.1990); therefore, the causation argument fails. Finally, an argument that the defendant's waste was released but was not the cause of the cleanup must fail because the statute does not mandate a release, an imminent release is enough to trigger CERCLA coverage. There cannot be a requirement that medical evidence support claims that the local population has already been harmed; if that were a requirement it would eliminate an entire category which Congress has specifically included. Early cleanup can avert major disaster; a doctrine that required a party to produce evidence of disaster would circumvent a purpose of the legislation.
*495 The final element of CERCLA coverage is that the actions which are taken must be necessary and taken in accordance with the NCP. The Court dismisses the defendant's argument, supported by authority from the Fifth Circuit, that strict compliance is required. Not only do the regulations call for "substantial compliance" 40 CFR § 300.700(c)(3)(i), (c)(4), but decisions in this circuit have followed the standard of substantial compliance Id. The rationale is that cleanup is encouraged, even if it is by private parties, and that if the court were to disallow reimbursement for insubstantial deviations from technical regulations, that policy would serve to block private cleanup actions. The Court finds that up to this point, all of the remedial actions taken by Anschutz have been done in accordance with the NCP and 42 U.S.C. 9601(23), (24). This includes, but is not limited to the sampling costs, the Dames & Moore Reports and the construction work done on the D dam.
The more difficult problem comes in determining what work must be done in the future. The Court determines that the parties must contain the contaminants. This must be done in the most cost effective way that will eliminate any future problems with run off contamination into the waterways or into the neighboring land and town, but must take into account the remote location of the site and lack of immediate population. The Court finds no justification for a complete removal action in which huge sums of money would be spent to take these contaminants from one remote part of the country to another remote part of the country. However, both parties are compelled to prevent the spread of this contamination so that further damage, with ensuing joint liability, will not occur.
Having found that both parties to this suit are liable, the Court turns to the allocation of liability. To address this issue, many courts have looked to the "Gore Factors", which were submitted to Congress to address this issue, but never adopted. This Court chooses not to address those factors specifically, since they do not serve as precedent, but certainly follows the premise that allocation must be done in an equitable fashion based on the Court's factual findings and legal conclusions. See, Gopher Oil Company v. Union Oil, 955 F.2d 519, 526-527 (8th Cir.1992); See also Pennsylvania v. Union Gas Co., 491 U.S. 1, 21, 109 S.Ct. 2273, 2285, 105 L.Ed.2d 1 (1989); Key Tronic Co. v. U.S., ___ U.S. ___, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994).
In the case at bar, the defendants were the long-time operators and the main users of the facility. The plaintiff has only owned the facility for a short time and its operations of the facility were minimal. The contaminants that represent the bulk of the hazardous waste were extracted by the defendant and are the defendant's legacy.
However, both parties are liable and the Court finds that the Defendant is Eighty Percent (80%) liable for the cleanup and containment costs of the site and the Plaintiff is Twenty Percent (20%) liable for the cleanup and containment costs of the site. That figure represents liability for past, present, and future cleanup efforts. The Plaintiff is also entitled to interest on the sums that have already been paid. 42 U.S.C. 9607(a); U.S. v. Allen, 1990 WL 339489, *2 (W.D.Ark.).
Having made that determination, the Court is left with the final issue of fees. In order to conserve the finite resources of the government and encourage prompt attention to environmental problems, private causes of action include the cost of attorney fees. U.S. v. Mexico Feed and Seed Co. Inc., 980 F.2d 478, 490 (8th Cir.1992). Therefore, the Court awards the plaintiff all reasonable fees connected with this litigation. That amount will not be effected by the liability allocation; the Plaintiff will receive One Hundred Percent (100%) of all reasonable fees that have been incurred.
Accordingly,
IT IS HEREBY ORDERED that the Plaintiff and Defendant are jointly liable for the cleanup costs of the Madison Mine site near Fredericktown, Missouri.
IT IS FURTHER ORDERED that the Plaintiff is allocated Twenty Percent (20%) of all cleanup costs and that the Defendant is *496 allocated Eighty Percent (80%) of all cleanup costs.
IT IS FURTHER ORDERED that the parties contain the contaminants within the site so that they pose no threat of release. This containment is to be done in the most cost effective manner in compliance with the NCP.
IT IS FINALLY ORDERED that the Defendant pay all costs already incurred, at the allocated liability rate, including prejudgment interest, and that the Defendant pay all reasonable attorney fees incurred by the Plaintiff in this action.